HON. MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | )  CR09-84MJP |
| | ) |
| v. | )  DEFENDANT'S SENTENCING |
| | )  MEMORANDUM |
| DONATA BAYDOVSKIY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**I.**

**INTRODUCTION**

On September 24, 2009, Donata Baydovskiy waived indictment and entered a plea of guilty to

a superseding information, in which she was charged with making a false statement in a matter within

the jurisdiction of a department and agency of the United States, in violation of 18 U.S.C. §1001.

Sentencing is scheduled to occur on **December 18, 2009, at 9:00 a.m.**  In this memorandum, we

outline our sentencing position and the law and the facts that support it.

A correct application of the Sentencing Guidelines in this case leads to an advisory range of

six to 12 months.  This is a substantially lower range than the ranges that were calculated for

codefendants Camie Byron (51 to 60 months), Alla Sobol (60 months) and David Sobol (60 months).

The lower range results from the "relevant conduct" rules and the plea agreement that the government

extended to this defendant.  In the plea agreement, she was permitted to plead guilty to a violation of

DEFENDANT'S SENTENCING
MEMORANDUM - 1

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

18 U.S.C. §1001 and did not agree to any particular loss amount, much less the multi-million dollar loss amount agreed upon by the other defendants.  The government did not extend its plea offer hastily or capriciously.  The government extended the offer – well aware of the significant advantages it would confer – after spending many hours intensively debriefing the codefendants and others.  The investigation afforded the government an in-depth understanding of this defendant's limited knowledge and role in the case, and it is no doubt in light of that limited knowledge and role that the plea agreement was reached.

We request the imposition of a sentence at the mid-point of the 6-12 month range.[1]

## II.

## "VLAD AND NETA"

We begin with a love story.

In early 2002, the parents of a Jewish man who lived in Issaquah, Washington were in search of a nice Jewish girl whom their son could marry.  Their son was young, but he was not getting any younger.  One of the people whom they contacted was a Dr. Sosnofskiy, an internist practicing in Tel

---

1.  The Probation Office recommends 18 months, which would represent an upward departure – it would be 50% higher than the high end of the range.  The Probation Office's recommendation is a downward variance from the Probation Office's guidelines calculations, and it is proposed as a means of recognizing this defendant's lesser involvement.  However, her lesser involvement has been recognized through the plea agreement and the guidelines calculations that flow from it.  There is no *need* for a *downward* variance from the correctly-calculated guidelines range, and there is no *justification* for an *upward* variance from that range.

Under 18 U.S.C. §3553(a)(6), one of the factors to be considered in imposing sentence is "the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct ..."  The conduct of which this defendant has been convicted is not "similar" to the conduct of which the other defendants have been convicted, in that her guilty plea did not include an admission that she had knowingly participated in jointly-undertaken criminal activity.

DEFENDANT'S SENTENCING
MEMORANDUM - 2

Aviv, Israel, whom they apparently knew from Belarus.  Dr. Sosnofskiy's assistant, Elda Brenner

Bykhovskiy, was married, but Dr. Sosnofskiy asked her if she knew of any eligible young women.

Edla suggested her younger sister, Donata Brenner.  Dr. Sosnofskiy told his friends, Arkadiy and

Lyudmila Baydovskiy, about Donata.  Arkadiy and Lyudmila told their son Vladislav.

Donata at the time was a 22-year old university student, majoring in computer science.  She

lived quietly with her parents, Mikhail and Larissa, in a small apartment in Holon, a suburb of Tel

Aviv.  (The Brenner family had moved from their home in Baku, Azerbaijan to Israel in 1991, to

escape the violent conflict between Azerbaijanis and Armenians known as the Nagorno-Karabakh

War.)  As an adolescent and in the University, Donata did not go to clubs or go out partying.  She had

a boyfriend, but he was the quiet type as well.  Many of their dates consisted of studying in the

library.

Dr. Sosnofskiy's introduction led to email conversations and phone conversations, in Russian,

between Donata and Vladislav.  Donata found Vladislav to be funny, animated, charming.  Donata

told Elda that she was beginning to have strong feelings toward this individual, even though she had

not yet met him face-to-face.

In the latter part of 2002, Vladislav told Donata that he was going to come to Israel to meet

her.  His flight was scheduled to arrive on December 18, 2002.  Donata, accompanied by Elda, went

to the Tel Aviv airport to meet the flight.  At the appointed arrival time, Vladislav emerged from the

plane as part of a group of young men.[2]  Donata was at once impressed by the fact that he was "the

life of the party," and the others seemed to look up to him.  Vladislav came up and handed Donata a

---

2. Vladislav had obtained a free ticket by joining a group of young American Jews whose
travel to Israel was funded by an American Jewish organization, as a means of deepening their
cultural and religious ties to Israel.

DEFENDANT'S SENTENCING
MEMORANDUM - 3

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

gift.  She unwrapped it and found a teddy bear.  The teddy bear had a zipper pocket.  In the pocket, Donata found a locket, and in the locket she found her birth stone.

Soon a rabbi, who came along on the flight as a guide or chaperone, insisted that Vladislav and Donata part, saying that the group's bus was waiting, and Vladislav left with the others.

Although she was with Vladislav for only a few minutes at the airport, Donata was smitten.

The group of which Vladislav was a part was heavily scheduled during its limited time in Israel.  However, Vladislav found ways to break away from the group and spend time with Donata. He came for dinner with her parents and wound up talking with them until past midnight.  Vladislav dressed in old clothes; he did not make extravagant purchases; he did not have fancy jewelry or other flashy possessions.  Indeed, on one occasion when they were going out, he wore clothing borrowed from Mikhail, in order to be more presentable.  He did not talk much about his business, only his interests and hobbies.

Ultimately, Vladislav dropped out of the tour group and used his own money to purchase a ticket, returning separately to Seattle.

Vladislav's visit to Donata and her family was followed by further emails and conversations and by a trip that Donata made to visit his family in Washington.  After returning from that trip, Donata confided in Elda that she was in love.  The two speculated about whether or not Vladislav felt the same way, whether he would propose, and what Donata would say if he did.

During Vladislav's next visit to Israel, when Donata came home from school she found that Vladislav had invited her to go out to dinner.  As usual, he was in somewhat of a hurry, it was rush-rush, he had everything arranged, and there was no reason for Donata to change or put on makeup. Donata went with him to the restaurant, where they were greeted by a banner that said "Vlad and Neta" and by Donata's family and many Israeli friends.  It was a party to celebrate an engagement –

DEFENDANT'S SENTENCING
MEMORANDUM - 4

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

though Donata had not expressly been asked to marry Vladislav and had not expressly agreed to marry him.  Yet it was what she wanted, and she was thrilled to say yes.

The couple were married in Tel Aviv in a religious ceremony on September 23, 2003.  They spent a few days in Eilat, Israel, accompanied by Vladislav's parents, and then left on a flight for Los Angeles.  Vladislav was in a hurry to get back to business at Kobay Financial, his real estate and mortgage brokerage firm which, in addition to having a principal office in Washington, was then operating an office in Southern California.

## III.

## THE SENTENCING GUIDELINES

### A.  The Differences Among Probation, the Prosecution and the Defense

The Probation Office recommends that the guidelines be applied in the following manner:

| | |
|---|---|
| Base Offense Level [§2B1.1(a)(2)] | 6 |
| Specific Offense Characteristic for Loss between $2.5 million and $7 million [§2B1.1(b)(1)(J)] | + 18 |
| Adjustment for 10 or more Victims [§2B1.1(b)(2)(A)] | + 2 |
| Less Adjustment for Having Played a Minor Role [§3B1.2(b)] | - 2 |
| Less Adjustment for Acceptance of Responsibility [§3E1.1(b)] | - 3 |
| Total Offense Level | 21 |

With a Total Offense Level of 21 and a Criminal History Category of I, a defendant faces an advisory range of **37 to 46 months**.

It appears that the government takes a different view.  We believe that the government's proposed guidelines application will be as follows:

Base Offense Level [§2B1.1(a)(2)]                                        6

DEFENDANT'S SENTENCING
MEMORANDUM - 5

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

| | |
|---|---|
| Specific Offense Characteristic for Loss between $30,000 and $70,000 [§2B1.1(b)(1)(D)] | + 6 |
| Adjustment for 10 or more Victims [§2B1.1(b)(2)(A)] | N.A. |
| Adjustment for Having Played a Leadership Role  [§3B1.1(c)] | + 2 |
| Less Adjustment for Having Played a Minor Role [§3B1.2(b)] | N.A. |
| Less Adjustment for Acceptance of Responsibility [§3E1.1(a)] | - 2 |
| Total Offense Level | 12 |

With a Total Offense Level of 10 and a Criminal History Category of I, a defendant would face an advisory range of **10 to 16 months**.

We agree, in part, and disagree, in part, with both the Probation Office and the government. We contend that the Guidelines should be applied as follows:

| | |
|---|---|
| Base Offense Level [§2B1.1(a)(2)] | 6 |
| Specific Offense Characteristic for Loss between $30,000 and $70,000 [§2B1.1(b)(1)(D)] | + 6 |
| Adjustment for 10 or more Victims [§2B1.1(b)(2)(A)] | N.A. |
| Less Adjustment for Having Played a Minor Role [§3B1.2(b)] | N.A. |
| Adjustment for Having Played a Leadership Role  [§3B1.1(c)] | N.A. |
| Less Adjustment for Acceptance of Responsibility [§3E1.1(a)] | - 2 |
| Total Offense Level | 10 |

With a Total Offense Level of 10 and a Criminal History Category of I, a defendant would face an advisory range of **six to 12 months**.

DEFENDANT'S SENTENCING
MEMORANDUM - 6

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

**B.  The Probation Office's Proposed Loss Amount Should Not be Used Because Clear and Convincing Evidence, that it Was Foreseeable to this Defendant, is Lacking.**

The largest single difference between the government and the defendant (on one hand) and the Probation Office (on the other hand) is with respect to the amount of the loss for which Donata should be held responsible.  The government and the defendant alike argue that the loss amount is the loss attributable to Donata's offense, $63,920.  The Probation Office argues that the loss amount for Donata should be the same as the loss for which all of the co-defendants have been and will be held responsible – *i.e.*, an amount between $2.5 million and $7 million.

The Probation Office's recommendation is based on the relevant conduct rules found in §1B1.3.  This guideline provides that a defendant should be held responsible for "all of the acts and omissions committed, aided, abetted, counseled, commanded, induced, procured or willfully caused by the defendant," §1B1.3(a)(1)(A), and in addition, in the case of a jointly undertaken criminal activity

> ([*which is defined as*] a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity [§1B1.3(a)(1)(B)].

We agree that under §1B1.3, in the case of jointly undertaken criminal activity, a defendant can be held responsible for criminal conduct of others that was "within the scope of the criminal activity that he jointly undertook," provided that the others' criminal conduct is "reasonably foreseeable" to him or her, Application Note 2 to §1B1.3.  We agree that *ordinarily*, under the Guidelines, the test is proof by a preponderance.

Although the preponderance standard is the one ordinarily used, in certain circumstances the sentencing court is instructed to apply a more demanding standard.  When the application of an enhancement under the Guidelines has "an extremely disproportionate effect on the sentence relative

DEFENDANT'S SENTENCING
MEMORANDUM - 7

1   to the offense of conviction," *United States v. Restrepo*, 946 F.2d 654, 659-60 (9th Cir. 1991) (*en*

2   *banc*), proof by a mere preponderance is not sufficient.  If consideration of the uncharged conduct,

3   and/or the conduct of others for which the defendant has not been convicted, would have the effect of

4   grossly increasing a defendant's sentencing range, the proof must meet the "clear and convincing

5   evidence" standard.  *United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001); *United States v. Hopper*,

6   177 F.3d 824, 832-33 (9th Cir. 1999).[3]  *United States v. Pike*, 473 F.3d 1053, 1057 (9th Cir. 2007) –

7   although finding that, on the particular facts of that case, the clear and convincing test had been

8   applied erroneously – provides a fair statement of the considerations that should inform the court in

9   this case:

10  (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in
    the indictment; (2) whether the enhanced sentence negates the presumption of innocence or

11  the burden of proof for the alleged crime; (3) whether the facts offered in support of the
    enhancement create new offenses requiring separate punishment;  (4) whether the increase in

12  sentence is based upon the extent of conspiracy; (5) whether the increase in number of offense
    levels is less than or equal to four; and (6) whether the length of the enhanced sentence more

13  than doubles the length of the sentence authorized by the initial Guidelines range 'in a case
    where the defendant would otherwise have received a relatively short sentence' [*quoting*

14  *United States v. Jordan, supra*].

15  In this case, all but one of the components – factor (1) – to be considered in deciding whether

16  or not to require "clear and convincing" proof have been met.  As to factor (2), the enhanced sentence

17  would punish Donata for participation in the overall conspiracy with which she was originally

18  charged.  However, unlike all of the other defendants, Donata did not plead guilty to conspiracy.  *See*

19  *generally, United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008) ("clear and convincing

20  _____

21      3.  By urging the court to use the "clear and convincing" standard of proof, the defense
    should not be seen as implicitly conceding that the proof would be sufficient to establish the

22  more-than-$2.5 million loss enhancement if the preponderance standard were used.  Indeed,
    information presented elsewhere in this memorandum shows that even if a preponderance

23  standard were applied, the evidence would still be insufficient to justify the imposition of the
    enhancement.

24

25  DEFENDANT'S SENTENCING
    MEMORANDUM - 8

26

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

evidence" test does not apply where the defendant has pled guilty to conspiracy and the issue before

the court is the loss attributable to the conspiracy, but it is applicable where a defendant's sentence is

proposed to be enhanced on the basis of uncharged or acquitted conduct).  To sentence Donata as if

she were guilty of conspiracy would undermine the presumption of innocence to which she is still

entitled with respect to the original charges.

As to factor (3), the facts underlying the loss enhancement would constitute new and separate

offenses – conspiracy and bank fraud.  As to factor (4), the increase in sentence appears to be based

on a conspiracy theory, but, as noted, the record shows that Donata did not have sufficient knowledge

to be held responsible for participating in the conspiracy.

As to factor (5), the increase in offense levels resulting from imposing the proposed

enhancement would be far more than four.  It is an increase of *14* levels (12 more levels based on

loss, and two more levels based on 10 victims).[4]  The increase proposed for this defendant dwarfs the

increases imposed in reported cases in which the Ninth Circuit has held that it was reversible error *not*

to apply the clear and convincing evidence standard.  *Compare United States v. Jordan*, 256 F.3d

922, 929 (9th Cir. 2001) (reversing a nine-level enhancement;  sentencing judge's failure to use "clear

and convincing" standard was reviewed under "plain error" standard);  *United States v. Mezas de

Jesus*, 217 F.3d 638, 642-43 (9th Cir. 2000) (reversing a nine-level enhancement, which had been

based on finding that defendant committed an uncharged kidnapping); *United States v. Hopper*, 177

---

4.  The 12 levels for loss, considered alone, would be more than enough to call for the use
of "clear and convincing."  However, because the additional two-level enhancement that would
be required if there were 10 or more victim banks follows necessarily from the use of the larger
loss number, it is reasonable to argue that we are dealing with an aggregate increase of 14.  *See
United States v. Jordan*, 256 F.3d 922, 929 (9th Cir. 2001) (a five-level increase for possession of
a firearm, and a four-level increase for committing an abduction to facilitate escape from the
scene of the crime, are treated as a single nine-level enhancement).

DEFENDANT'S SENTENCING
MEMORANDUM - 9

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

F.3d 824, 832-33 (9th Cir. 1999) (reversing a seven-level enhancement for defendant Reed, which

increased Reed's sentencing range from 24-30 months to 63-78 months, because the district court had

failed to apply the clear and convincing evidence test).

As to factor (6), whether the enhanced sentence more than doubles the guidelines range in a

case where the defendant would otherwise have received a relatively short sentence, this factor, too, is

present. If one applies the proposed enhancement, the guidelines range for this defendant is more

than doubled. The *un*enhanced range for Donata is six to 12 months. The *enhanced* range for Donata

is 37 to 46 months. Plainly, the loss and multiple victims enhancements that the Probation Office

recommends would convert a comparatively short sentence into a long one.

For all the foregoing reasons, in considering whether the record supports the Probation

Office's guidelines calculations, the court should apply the "clear and convincing evidence" test.

Clear and convincing evidence, that the criminal acts of the other defendants were foreseeable

to Donata, is lacking.

First, it seems that Donata's placement in the escrow industry, from her receptionist job with

Escrow Authority at a time when her English was limited to a few words, onward, had everything to

do with her husband's desire to have a captive escrow company.[5] She had no experience of a

comparable sort, prior to her marriage. Although Donata had worked as an assistant at other escrow

companies, when Emerald City Escrow began "there was still a lot that from what I still saw that she

---

5. Donata had thought of working in computers, since her university training was in that area. However, Vladislav said that she should work in escrow because the computer field was no longer lucrative. He then arranged for Donata to work as a receptionist at Escrow Authority, where she was hired despite her lack of English, apparently because Vladislav gave Escrow Authority so much business. Following Escrow Authority, at Vladislav's urging Donata gained experience by working as an escrow assistant at Fidelity National Escrow and Stewart Title, before Emerald City Escrow was formed.

DEFENDANT'S SENTENCING
MEMORANDUM - 10

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

didn't know.  She – there was a lot that, uh, kind of learn-as-you-go ..." [David Sobol Proffer, June 10, 2009, p. 53, JNKS_001763].  While handling escrows at Emerald City Escrow for Vladislav's firm, Nationwide Home Lending LLC, Donata was told by Vladislav not to worry, he knew what he was doing, don't ask questions.

Others who worked with Vladislav have recounted how Vladislav controlled his wife.  For instance, Alla Sobol gave the following account [Alla Sobol Proffer, April 16, 2009, p. 70, JNKS_000634 (emphases added)]:

Q.  Okay.  So she [Donata] was over at Emerald City.  What kind of stuff was she doing?

A.  *Everything that Vlad told her to do.*

Q.  Okay.  And what would that entail?  Would she do double HUDs?

A.  Absolutely.

Q.  Triple HUDs?

A.  Absolutely.

Q.  Quadruple HUDs?

A.  *Anything he wanted.*

Camie Byron was asked about the extent to which Donata was involved in the business of Emerald City Escrow.  She replied: "I do know like, well, Vlad wanted, it was Vlad wanted to start a escrow company, and then I know he wanted his wife to be part of it"[6] [Camie Byron Proffer, May

---

6.  Donata was only nominally involved in the formation of Emerald City Escrow.  In his proffer, for example, David Sobol said that "Vlad and myself" had gone to the law offices of J. K. to discuss the formation of Emerald City Escrow.  Mr. Sobol did not state that Donata was present [David Sobol Proffer, June 10, 2009, p. 45, JNKS_001755].  When the operation of Emerald City Escrow was being discussed, Donata "basically just agreed to whatever was discussed that she was going to be the manager, the owner ..." [David Sobol Proffer, June 10, 2009, p. 45, JNKS_001755].

DEFENDANT'S SENTENCING
MEMORANDUM - 11

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

28, 2009, Part I, p. 15, JNKS_001636].  Byron commented that "from the get-go Vlad wanted Neta [Donata] doing his files and only Neta because Vlad says 'jump,' Neta will jump, you know" [Camie Byron Proffer, May 28, 2009, Part II, pp. 2-3, JNKS_001672-73].

Second, the record shows that Vladislav "was private about his assets" [Camie Byron Proffer, May 28, 2009, Part II, p. 14, JNKS_001684].  Vladislav had a brokerage account with a balance, shortly before their arrest, of more than $4 million.  Donata did not know of the account until after their arrest, for the account was in his name only, and he had arranged to have the monthly statements mailed to his parents' address.  The condominium where couple lived was recorded as being owned by Vladislav as "a single man."[7]  Vladislav had made enough money to pay off the debt on the condominium, but Donata did not know he owned the condominium free and clear until defense counsel told her, long after they had been arrested.

Third, one must focus on the limited perspective that Donata had, as an escrow closer.  One cannot indulge the assumption that because she was married to Vladislav, she knew of or could foresee his fraudulent activities.  Donata's crime did not involve a borrower's making false

---

7.  Discussing Vladislav and Viktor Kobzar, Camie Byron said [Camie Byron Proffer, May 28, 2009, Part II, pp. 21-22, JNKS_001691-92] that

... if you're looking, if it says, like, "single man," like, all of Vlad and Viktor's transactions they did –

Q.  Um hum.

A.  – they were always single.

Q.  Yeah.

A.  They were – they were never married person on paper.  I mean, they – they won't even wear their wedding rings ...

DEFENDANT'S SENTENCING
MEMORANDUM - 12

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

statements about income, assets, intent to occupy the home as their primary residence, etc.  The crime involved Donata's preparing a HUD-1 closing statement relating to E. Z.'s purchase of a property in Quincy, Washington.  The HUD-1 closing statement was false in that it showed that E. Z. had made a down payment into escrow in the amount of $50,000, whereas in fact, E. Z. had not made any payments into escrow.  By falsely stating that E. Z. had made a significant down payment, Donata made it possible for E. Z. to qualify for a larger loan than he or she would otherwise have been able to qualify for.  By concealing from the lender the fact that the lender was, in effect, making a "zero-down" loan, the false statement exposed the lender to a level of risk that it would not otherwise have accepted.

As an escrow closer, Donata was not in a position to investigate the representations that the borrowers had made in their loan applications, and to a large extent she may not even have seen the applications themselves.  Her role was to close the transactions, as instructed.  The fact that she prepared a false HUD-1 statement does not permit the inference that she knew of, or could foresee, the frauds committed by others.  Alla Sobol, despite being repeatedly pressed by the agents to say that Donata was fully aware of the others' offenses, explained that as an escrow closer Donata had only a limited vantage point [Alla Sobol Proffer, April 16, 2009, pp. 70-71, JNKS_000634-35 (emphases added)]:

Q.  Okay.  So she [Donata] was totally aware of everything that was going on?

A.  Yes.

UNIDENTIFIED: Well, that's a big question.

Q.  She was totally aware that there were (inaudible) pay stubs and –

A.  *She was not aware of the W-2's and pay stubs, no.  She – we –*

Q.  But she knew there were straw buyers.

DEFENDANT'S SENTENCING
MEMORANDUM - 13

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

A. *I don't think she knows the definition of a straw buyer.*

Q. But she knew these people weren't really buying these houses to live there and didn't make the income that they claimed to make.

A. *Okay. Escrow's job wasn't really to, I guess, analyze the income.*

Q. Okay.

A. Or *I don't think they knew the specifics of the loan. ...*

The questioner approached Ms. Sobol with the assumption that Donata was fully aware of the scope of the fraud. Ms. Sobol knew that Donata was not fully aware, and she would not allow herself to be pushed into overstating the scope of Donata's knowledge and involvement.[8]

It appears that the government agrees that the proof needed to hold Donata responsible for the larger loss number cannot be established by clear and convincing evidence.[9] The government agrees that the loss number for Donata should be $63,920. Under these circumstances, the "loss" enhancement should be six levels, not 18. Moreover, without the large loss number, there is no basis for applying the two-level multiple victim enhancement. As a result, the Adjusted Offense Level should be 14 levels less than the number recommended by the Probation Office.

---

8. In one of her proffers, Camie Byron made the same point. She said, "So like the escrow file, escrow officers really don't have anything to do with the 1003's or the loan application. They get the loan documents from the lender, they put together the HUD and print it ..." [Camie Byron Proffer, June 17, 2009, p. 30, JNKS_002245].

9. The government stated, at the sentencing of Camie Byron, that it had concluded that Donata was brought in by and "used" by Vladislav.

DEFENDANT'S SENTENCING
MEMORANDUM - 14

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

**C.  The Government's Proposed Two-Level Enhancement for Leadership Should be Rejected because the Record is Devoid of Proof that Donata Supervised or Managed Other Criminally-Responsible Participants in the Offense.**

In an emailed objection to the draft presentence report, the government argued that Donata's offense level should be increased by two levels under §3B1.1(c) because she allegedly played a supervisory role in the transaction.  The argument should be rejected.[10]

The government explained its position by stating that Donata "supervised the escrow component of the transaction, without which the fraud would not have succeeded."  We agree that she played a wrongful part in the transaction, for which she should be punished.  However, the process of assigning "leadership" enhancement points generally requires identifying the persons whom the defendant is alleged to have supervised or managed.  *Cf. United States v. Berry*, 258 F.3d 971 (9th Cir. 2001).  The government has not identified anyone else at Emerald City Escrow, or elsewhere, whom Donata is alleged to have supervised or managed.  Moreover, those whom the defendant supervised or managed must themselves be criminally involved, before the enhancement can be applied.  *See* Application Note 1 to §3B1.1.

In view of the foregoing, the government's proposed enhancement should not be included in the calculation of the range under the Sentencing Guidelines.

## IV.

## THE VICTIM STATEMENTS

Defense counsel has carefully reviewed the victim impact statements with his client.  Words of remorse, no matter how sincere, cannot lessen the pain that the victims have experienced, and

---

10.  The final presentence report states that the government did not object to the draft presentence report.  However, the defense was copied on an email presenting this objection.

DEFENDANT'S SENTENCING
MEMORANDUM - 15

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

continue to experience.  However, we want the court and the victims to know that Donata has heard

the victims' words and responded as any right-thinking person would – with heartfelt remorse.

We are compelled to clear up one small point, however.  This point concerns M. B.'s victim

impact statement.  M. B. states that Donata laughed in her face and mocked her, in Russian, when she

went to the Emerald City Escrow office seeking an explanation concerning her transaction.  With all

due respect, the gratuitously and disrespectful behavior the M. B. has attributed to Donata – which

would have been utterly out of character for Donata[11] – has erroneously been ascribed to Donata.  M.

B. has never met Donata.  Donata was in Israel when M. B. went to the Emerald City offices seeking

information about her transaction, at a time which was, as M. B. recalls, "several months after" the

transaction had closed.  The transaction closed in May 2007.  Donata and Vladislav were out of the

country between late October 2007 and early January 2008.  They were not in the office when M. B.

came seeking information about the transaction.  This was confirmed by Viktor Kobzar, who stated in

his proffer [Viktor Kobzar Proffer, August 12, 2009, pp. 29-30, JNKS_002592-93 (emphasis added)],

... that's when Alla, David and I were behind the computers and trying –

Q.  Huh.

A.  – to figure it out *because he [Vladislav] is out of the country*, he cannot, uh, we need to or,
uh, David, Alla felt obligated to, uh, give some answers to [M. B.] so we, uh, they asked me
also to look through the transaction and kind of figure things out and start calculating numbers
and it appeared a lot, a lot of money were just missing so to speak.

---

11.  We refer the court to the letters of support which are attached hereto, collectively, as
Exhibit A.

In the letters, Donata is described as a "friend and good listener" (Shevstov Letter),
"honest, responsible and trustworthy" (Igor Zatulovsky Letter), sweet, open-hearted and loving
(Maksimyuk Letter), "polite, well mannered" and not one who would ever raise her voice to
another (Bernik Letter).  Natalie Ananichev writes:  "In some way she is like a child naive and
think that all people around, people in her environment, are good and straight and never will
harm her."

DEFENDANT'S SENTENCING
MEMORANDUM - 16

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

1   In short, the encounter to which M. B. referred occurred when Vladislav was out of the

2   country.  The only times that Vladislav was out of the country were when, on occasion, he

3   accompanied Donata on one of her trips Israel.  If Vladislav was out of the country, Donata was out

4   of the country as well.

5                                          **V.**

6                                     **CONCLUSION**

7         Donata will be sentenced on December 18, 2009, seven years to the day from the day when

8   Vladislav emerged from the aircraft in Tel Aviv, bringing his teddy bear present.  Her love, trust,

9   naivete and innocence were her undoing.

10        Donata was arrested, along with Vladislav, in Los Angeles on March 26, 2009.  Their four-

11  year-old was with them.  The California child welfare authorities placed him in foster care, where he

12  remained for three weeks until Washington's child welfare authorities determined that a safe

13  placement, with Vladislav's parents, was available in Washington.  Donata and Vladislav were

14  incarcerated, and she remains incarcerated at this time (as does Vladislav).  Because of her ties to her

15  family in Israel, her frequent travel to Israel for long visits with her parents and sister,[12] and

16  unresolved questions about Vladislav's finances, of which she had been kept in the dark, she was

17  found to be a flight risk and was not released on bond.  She has now served more time than Camie

18  Byron, Alla Sobol and David Sobol.

19

20  _____

    12.  Donata's passport, which can be presented to the court at the time of sentencing but
21  is not being filed as a matter public record for security reasons, shows that she was in Israel
    during substantial periods when Emerald City Escrow was operating – October 7, 2006 through
22  October 24, 2006, October 28, 2007 through January 4, 2008, April 30, 2008 through May 6,
    2008, and December 6, 2008 through January 29, 2009.  These documented absences are
23  consistent with the Probation Office's finding that "Ms. Baydovskiy was not actively involved in
    the day-to-day operations of the escrow business."  Presentence Report, ¶26.
24

25  DEFENDANT'S SENTENCING                                    Law Offices of Allen R. Bentley
    MEMORANDUM - 17                                           1111 Third Avenue, Suite 2220
26                                                            Seattle, WA 98101-3207
                                                              (206) 343-9391

Donata has served her time at the Sea-Tac Federal Detention Center.   As the court observed during the sentencing of Camie Byron – when Ms. Byron's attorney was "thinking out loud" about requesting a judicial recommendation for the incarceration of Ms. Byron at Sea-Tac, and the court said that it would not make such a recommendation – the Federal Detention Center is not a good place at which to serve a long sentence.  Even worse, Donata's unit, Unit F-A, is the only unit housing female inmates that includes a "special housing unit" ("SHU"), a prison-within-a-prison used for punishing those who have broken the rules, for monitoring those who are suicidal or otherwise unmanageable, etc.  Although Donata has been a model inmate and has never been in the SHU, having been placed in Unit F-A at random, inmates in Unit F-A spend much more time locked in their cells, than do the inmates in the other female units.  Donata's punishment to date has therefore been more severe, in terms of the conditions she has been incarcerated under, than the punishment that will be inflicted on Ms. Sobol and Ms. Byron, given that they will in all likelihood serve their sentences at Dublin.[13]

Donata is the *least* culpable of the defendants.[14]  The fact that her nine-month incarceration while awaiting trial, and then sentencing, has been in a facility designed for short-term pretrial detention should be taken into account in determining whether or not additional incarceration would be fair.

---

13.  We are confident that Ms. Byron and Ms. Sobol will be designated to the Federal Correctional Center at Dublin, California, as recommended by the court, for service of their sentences, and that they will self-report sometime in February 2010, as required.  Dublin is a model correctional facility and presents opportunities for breathing normal air, walking under the sky, and engaging in educational programs that are not available at the Sea-Tac facility.

14.  The government is in accord with this view of Donata's relative culpability and so informed the court, in response to a question from the court about its view of the overall culpability ranking, during the sentencing of Camie Byron.

DEFENDANT'S SENTENCING
MEMORANDUM - 18

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

1   Donata has served enough time.  We recommend that she be sentenced to 267 days

2   incarceration, with credit for time served, to be followed by three years' supervised release.  Such a

3   sentence would permit her to be re-united with her boys (and to reunite the brothers themselves,

4   because until now they have been separated into the care of their grandmothers), and to begin

5   building a law-abiding and normal life – a life that would be modest, simple and loving, like the one

6   she knew as a good Jewish girl growing up in Azerbaijan and Israel.

7   DATED this   14th   day of December, 2009.

8                                       Respectfully submitted:

9                                       LAW OFFICES OF
                                        ALLEN R. BENTLEY

10

11                                      By: /s/ Allen R. Bentley
                                           ALLEN R. BENTLEY
12                                         WSBA No. 12275
                                           Law Offices of Allen R. Bentley
13                                         1111 Third Avenue
                                           Seattle, WA  98101
14                                         Telephone: (206) 343-9391
                                           Fax: (206) 682-3746
15                                         Email:  abentley@concentric.net

16

17

18

19

20

21

22

23

24

25   DEFENDANT'S SENTENCING
     MEMORANDUM - 19
26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE

I certify that on December 14, 2009, I electronically filed the foregoing Defendant's

Sentencing Memorandum with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the attorney of record for the United States of America, Assistant United

States Attorney James Oesterle.

By: /s/ Allen R. Bentley
ALLEN R. BENTLEY
WSBA No. 12275
Law Offices of Allen R. Bentley
1111 Third Avenue
Seattle, WA  98101
Telephone: (206) 343-9391
Fax: (206) 682-3746
Email:  abentley@concentric.net

DEFENDANT'S SENTENCING
MEMORANDUM - 20

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391